No. 96,081

STATE OF KANSAS, *Appellee*, v. ARTHUR HERRON, *Appellant*.

(189 P.3d 1173)

 Opinion
filed August 15, 2008. 

*Korey A. Kaul*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Michael A. Russell*, chief deputy district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Paul J. Morrison*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This case arises out of a day-long series of shootings in Kansas City, Kansas, during which the victim, Deborah Jackson, was killed from outside her home. Defendant Arthur Herron, who admitted to being in a van with four others at the scene of the fatal shooting, was convicted of first-degree felony murder and conspiracy to commit criminal discharge of a firearm at an occupied dwelling; he was acquitted of the criminal discharge offense underlying the felony murder. In this appeal, he argues that the evidence was insufficient to support his conviction of felony murder and that the district court erred in failing to give self-defense and voluntary and involuntary manslaughter instructions.

### Factual and Procedural Background

On the evening of September 20, 2004, gunfire riddled the home of Deborah and her husband, John Jackson; Deborah was fatally shot. John, who told police he had been downstairs watching television when he heard shots, saw a white van containing five or six people speed away from the scene.

There had been an ongoing feud between the Jacksons' son, Eric, and neighborhood brothers Marcus and Sheldon Carson. This feud began several years prior with the murder of Winston Grady, a friend of the Carsons. The Carsons blamed Eric for Grady's death.

Eric's girlfriend, Mercedes Sappington, had stayed all night at the Jacksons' home on September 19, 2004. The next day, Eric

borrowed Deborah's car to take Sappington to get her work clothes. They passed a group of five or six men in white t-shirts at about 27th and Garfield in Kansas City, Kansas. One of the men was Marcus. Sappington knew another one of the men to be Jazwane Jefferson, and she later identified defendant Herron as one who had been in the group. After Eric and Sappington had passed the group, according to Sappington, Marcus came running up, pulled out a gun, and shot at their car.

Later investigation revealed no bullet holes or other damage to Deborah's car. Other testimony indicated that it was Eric who was armed and that he had been shooting out of his window at the group of men.

When Eric and Sappington returned to the Jacksons' house midday, Sappington told Deborah and John that they had been shot at. Over Eric's protests, Deborah and Sappington left in Deborah's car, ostensibly so that Deborah could take Sappington either home or to work. According to Sappington, however, Deborah asked where the group of men was, and she said she wanted them to stop persecuting her family. Sappington eventually gave Deborah directions to 27th and Garfield, but the group was no longer there.

Deborah then decided to drive to the Carsons' house. As she drove down the Carsons' street toward its cul-de-sac, she and Sappington saw a large group of black men, all dressed in white t-shirts. When the group saw their car, the men started running back toward houses. Sappington recognized Marcus, who turned and began shooting at the women. Deborah yelled at Marcus and kept driving. Deborah called John and told him they had been shot at again by Marcus. At trial, John indicated that Deborah had mentioned Herron's name as one in the group.

The women saw a police officer, told him about the shooting, and asked him to call dispatch. They drove to a cousin's house near the Carsons' cul-de-sac, and saw the men putting guns in a truck. Deborah dropped off Sappington and then went to a police station to file a report.

At about 3 p.m., police were notified that the Herron family's house, where defendant lived with his mother and little brother, had been the target of drive-by gunfire that afternoon. Ballistics

testing linked casings discovered at the scene to a Maadi rifle belonging to Eric.

About 3:30 p.m., Kim Carson, Marcus and Sheldon's sister, called police and reported another shooting, this one at her house.

Between 9 p.m. and 10 p.m., some close friends of Herron and Marcus, including Brent Brown, a.k.a. "Poopananie," who was "like [a] little brother" to Herron, were driving down a street when they were cut off and fired upon by individuals in a large, dark blue or black SUV. The group notified Marcus of the shooting, and the consensus was that Eric was behind it.

At about 10:20 p.m., police responded to the shooting that killed Deborah. Eric arrived at the house shortly thereafter and was so beside himself that police asked him to leave so that he would not interfere with the paramedics attempting to assist his mother. He ran away. Police found a large amount of broken glass and acceleration marks in the street outside of the Jacksons' house.

About 15 minutes after police arrived at the Jacksons' house, they heard a large amount of rapid gunfire coming from the east. Officers were subsequently dispatched to a house 5 blocks away. That house had also been fired upon.

Near that house, police discovered a white van. Its windows were partially shot or broken out, and it was full of glass and different types of shell casings. The casings were later determined to include 20 7.62 x 39 mm casings, fired from two different AK- or SKS-type guns; 8 .9 mm casings, fired from two different guns; and 4 casings associated with a .40 caliber gun. Additional investigation revealed that the van had been stolen an hour or two before the shooting of Deborah. Ballistics reports indicated that the damage to the van was caused by shots being fired from the inside of the van.

Deborah's husband suggested to police that they should investigate Marcus and Sheldon Carson. In October, police detained Herron for questioning and *Mirandized* him. Herron initially said that he was in no way involved in the shooting and that he was in Topeka when it happened. He later admitted that he was in Kansas City, Kansas, and, finally, that he was in the van with four others: Marcus, Jefferson, Steve Coleman, and Joshua Jones.

Detective Greg Lawson later testified that, in an informal, un-recorded interview, Herron said he knew that there had been a shoot-out between Eric and Marcus earlier in the day; that Eric was responsible for shooting at Herron's house that afternoon; and that Eric had shot at his friends in their car. Herron stated that Coleman stole the van, and the group loaded it. According to Lawson's testimony, Herron stated it was never the group's intention to kill anybody; they only intended to shoot at the Jacksons' house. Herron stated that Jefferson, Jones, and Coleman were armed; he and Marcus were not and did not do any shooting.

Herron later agreed to sign a written waiver of his *Miranda* rights and made a videotaped statement that was later transcribed. In his statement, he recounted the events of the day Deborah was killed. He stated that, after his own house was shot at, he and his friends got together to talk about "confronting" Eric. Herron said they were not talking about doing anything to the Jacksons, "just talking about trying to find Eric." When the group heard that Eric had fired on their friends' car, they decided to act on their desire to find him. Coleman had stolen a van so that the group would not be recognized. Although Herron and Marcus were not armed, the group was aware that Eric probably would be armed and was ready for anything.

At one point, Lawson said:

"Q. [Detective Lawson:] . . . Now last night, I'm referring to my notes here, Arthur, and you told me last night here that you guys went over there just to shoot at the house, not to shoot at anybody.

"A. [Herron:] We didn't even go over there to shoot at the house. I didn't tell you we went over there to shoot. We went over there to confront Eric. We never went over there to shoot the house."

Herron maintained that the group drove up in the van to see if anybody was at home at the Jacksons', and someone started firing. He did not know who or whether the shots came from inside or outside the van. As soon as the shooting started, he said, he ducked his head, essentially lying on the floor of the van, until it drove away. Herron said the house was completely dark when the van approached it, and he never saw anyone. He said:

"That's why we was like, we need, I was, that's all we like 'fuck it, let's go.' You know what I'm saying, 'aint nobody here.' But I guess they was so pent up on house being shot up that they was like 'fuck it, we just gonna shoot this house up.' It was a spare [*sic*] of the moment thing. It wasn't like it was planned for us to go over there, shoot and, and somebody accidentally kill Miss Jackson. That ain't what was supposed to happen . . . . We wasn't even supposed to shoot at the house. . . . I think that they just want to do something. I think that they felt that something had to be done."

Lawson indicated at trial that he had shredded his notes containing information from his initial, unrecorded interview of Herron, the one in which Herron had said the group's plan was to shoot at the Jacksons' house but not to kill anyone.

Herron and Jefferson were jointly charged in a third amended information with criminal discharge of a firearm at an occupied dwelling in violation of K.S.A. 21-4219(b); conspiracy to commit criminal discharge of a firearm in violation of K.S.A. 21-3302; and first-degree felony murder in violation of K.S.A. 21-3401(b). At the preliminary hearing, a district judge bound Herron over for trial and granted the prosecutor's unopposed motion to sever. Later, a different district judge, the one who would eventually preside over Herron's trial, granted Herron's motion to suppress comments on Herron's credibility made by investigating officers and by other witnesses. The judge declined to restrict the State's introduction of evidence about the feud between the families and denied suppression of Herron's statements from the initial unrecorded interview.

The evidence at Herron's trial substantially conformed to the facts set out above. The State also admitted an audiorecorded conversation between Herron and his mother, made while Herron was in jail. In that conversation, Herron told his mother that she had made a mistake by talking to police; that he had a "nice little story" he could have told them; and that he was aware other individuals were telling the police about him. The transcript of the conversation is not contained in the record on appeal, and, although the audiotape is, it is very difficult to understand the substance of what was said.

The defense proceeded on a theory that the group in the van had no preconceived intent to shoot at the Jacksons' house, that

Herron was unarmed, that the Jacksons fired on the van first, and that the three armed men in the van fired back. The defense presented evidence that there was a bloody black t-shirt and a bloody towel at the Jacksons' house after the shooting and that there was a box of ammunition across the street that Eric must have hid when he left the scene. It suggested either that there was no television in the Jacksons' basement or that it was turned off when police arrived, implying Deborah's husband had lied about what he was doing when the shooting occurred. Herron did not testify.

The jury was instructed on criminal discharge of a firearm at an occupied dwelling, conspiracy to commit criminal discharge of a firearm at an occupied dwelling, and first-degree felony murder based on the underlying felony of criminal discharge of a firearm at an occupied dwelling. The jury was also given an aiding and abetting instruction. Herron requested no additional instructions.

After the jury returned its verdict, Herron filed a motion for a new trial based on insufficient evidence to support conspiracy. The district judge denied the motion after a hearing. The judge expressed surprise that the jurors had acquitted on criminal discharge, because "frankly, based upon the evidence, they probably should have found him guilty of that count also." Herron was sentenced to life imprisonment, plus 32 months to run consecutively. This appeal, pursuant to K.S.A. 22-3601(b)(1), followed.

## Sufficiency of the Evidence

Herron argues that, although there was a wealth of evidence regarding the events leading up to the shooting at the Jacksons' home, the evidence of the actual event was scant and composed only of his statement and Lawson's testimony. He argues that the State failed to meet its burden to prove that he was in any way involved beyond being present in the van and an associate of the shooters, or that he did or said something to assist in the criminal discharge of a firearm that led to Deborah's death.

First-degree felony murder is "the killing of a human being committed . . . in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto." K.S.A. 21-3401(b). Criminal discharge

of a firearm at an occupied dwelling is an inherently dangerous felony that can support a felony-murder conviction, K.S.A. 21-3436(a)(15); conspiracy is not. At this point, Herron does not contest the sufficiency of the evidence supporting his conspiracy conviction. Rather, he focuses on the sufficiency of the evidence to support criminal discharge of a firearm at an occupied dwelling, the charge on which he was acquitted.

Under our precedent, the fact that a defendant is acquitted of an underlying felony does not automatically require reversal of a felony-murder conviction. In *State v. Shultz*, 225 Kan. 135, 142, 587 P.2d 901 (1978) (quoting *State v. McCorgary*, 218 Kan. 358, 366, 543 P.2d 952 [1975], *cert. denied* 429 U.S. 867 [1976]), this court noted that reversal is not required in cases where two verdicts are irreconcilable. See *State v. Meyer*, 17 Kan. App. 2d 59, 65, 832 P.2d 357 (1992).

In *State v. Wise*, 237 Kan. 117, 122-23, 697 P.2d 1295 (1985), this court summarized a New York case, *People v. Murray*, 92 A.D.2d 617, 459 N.Y.S.2d 810 (1983), as follows: "In [*Murray*], the court held that the completion of the underlying felony is not an essential element of felony murder, and that an acquittal of the underlying felony is not inconsistent with a conviction of felony murder." *Wise* also noted: "At any rate, consistency in a verdict is not necessary; a verdict, though inconsistent, is not erroneous so long as there is sufficient competent evidence to support it. [Citations omitted.]" 237 Kan. at 122. *Wise* also specifically held that a charge and conviction of an underlying felony is not necessary to sustain a conviction of felony murder: "We hold that under our statute, K.S.A. 21-3401, an accused need not be prosecuted [for] or convicted of the underlying felony in order to be convicted of felony murder." 237 Kan. at 123; see *State v. Dixon*, 279 Kan. 563, 571, 112 P.3d 883 (2005); *State v. Beach*, 275 Kan. 603, 615-17, 67 P.3d 121 (2003); see also *State v. Antwine*, 4 Kan. App. 2d 389, 396, 607 P.2d 519 (1980) ("While the verdict may be somewhat inconsistent, substantial competent evidence exists to support it and we find no error. Our Supreme Court has recognized that a jury may sometimes reach its verdict partially out of clemency for the accused.").

Thus, the jury's acquittal aside, our charge is to determine whether, after review of all the evidence, examined in the light most favorable to the prosecution, we are convinced a rational fact-finder could have found Herron guilty beyond a reasonable doubt of felony murder based on an underlying felony of criminal discharge of a firearm at an occupied dwelling. *State v. Scott*, 285 Kan. 366, 372, 171 P.3d 639 (2007); *State v. Swinney*, 280 Kan. 768, 778, 127 P.3d 261 (2006). While the State must sustain its burden of proof on each element of an offense, circumstantial evidence and the logical inferences therefrom can be sufficient to support a conviction of even the most serious crime. *Scott*, 285 Kan. at 372; *State v. Murillo*, 269 Kan. 281, 286, 7 P.3d 264 (2000).

Criminal discharge of a firearm at an occupied dwelling is "the malicious, intentional and unauthorized discharge of a firearm at a dwelling . . . in which there is a human being." K.S.A. 21-4219(b). Herron argues, and we agree, that the evidence may be insufficient to establish his guilt for criminal discharge as a principal. But, as he notes, criminal liability may be established on an aiding and abetting theory. Under K.S.A. 21-3205(1), a person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels, or procures the other to commit the crime.

Herron insists that the evidence demonstrates mere presence and association with the others in the van, not that he was willfully furthering the success of the venture. He believes his situation to be akin to that of the witnesses in *State v. Simmons*, 282 Kan. 728, 148 P.3d 525 (2007). In that case, three witnesses were aware of defendant's plan to rob a victim, and they ultimately received some fruits of his illegal labors in the form of $100 bills, incentives for silence. The defendant sought reversal of his convictions based on the district court's failure to caution the jury concerning "accomplice testimony" in accord with PIK Crim. 3d 52.18. We concluded there was no error because, *inter alia,* the witnesses were not accomplices; they did not participate in the crime. We held that their mere presence during the planning stages, their failure to stop or report the crime, and their receipt of stolen goods absent a pre-

arranged plan of theft and delivery did not make them accomplices. 282 Kan. at 737-39.

Herron is correct that mere association with a principal who actually commits a crime or mere presence in the vicinity of the crime is itself insufficient to establish guilt as an aider and abettor. However, when a person knowingly associates with an unlawful venture and participates in a way that demonstrates willful furtherance of its success, guilt as an aider and abettor is established. See *Simmons*, 282 Kan. at 738; *State v. Kaiser*, 260 Kan. 235, 242, 918 P.2d 629 (1996), *disapproved on other grounds State v. Gonzalez*, 282 Kan. 73, 145 P.3d 18 (2006); *State v. Hobson*, 234 Kan. 133, 138, 671 P.2d 1365 (1983).

In this case, Herron's situation is distinguishable from that of the *Simmons* witnesses. See 282 Kan. at 736. According to Herron's unrecorded statements, he did more than listen to his associates' discussion. He participated in the planning, the mobilization, and the actual attack. We acknowledge that Herron's videotaped interview conflicted somewhat with his unrecorded statements, as reported to the jury by Lawson; but this is not fatal to the prosecution's case. A rational factfinder could easily have concluded that Herron was a willing participant in a planned, retaliatory shooting. His friends had traded gunfire with Eric throughout the day; his good friend had been shot while in a car; and his own house had been fired on earlier. Furthermore, Herron's associate had stolen the van so that they would not be recognized; the group loaded it with pistols, high-powered semi-automatic rifles, and ammunition; they drove to the Jacksons' house; and they pummeled it with more than 30 rounds before speeding away, ditching the van, and scattering. Herron's felony-murder conviction was supported by sufficient evidence.

One additional point merits mention. The State urged us to consider that 9 hours passed between the first shooting and the murder, giving Herron a "long time to walk away." At oral argument before this court, Herron's counsel urged this court to overrule our decisions in *State Wakefield*, 267 Kan. 116, Syl. ¶ 3, 977 P.2d 941 (1999), and *State v. Smolin*, 221 Kan. 149, 152-53, 557 P.2d 1241 (1976), which held that a defendant's failure to oppose the com-

mission of a crime can be considered, along with other circumstances, in determining the sufficiency of evidence of aiding and abetting. We do not reach this issue here, because we need not rely on Herron's failure to walk away or oppose the crime to arrive at our conclusion.

## Self-Defense Instruction

Herron next argues that the district court erred in failing to instruct the jury on self-defense because, without such an instruction, the jury had no legal avenue to accept his theory of defense. Defendant acknowledges that, because no such instruction was requested, we review its omission for clear error. See K.S.A. 22-3414(3). Under this standard, we will reverse only if we are firmly convinced that, absent the alleged error, there was a real possibility the jury would have returned a different verdict. *State v. Cooperwood*, 282 Kan. 572, 581, 147 P.3d 125 (2006).

In a criminal action, the district court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence, even though the evidence thereon is slight or supported only by the defendant's own testimony. *State v. Bell*, 276 Kan. 785, 792, 80 P.3d 367 (2003); *State v. Barnes*, 263 Kan. 249, 265, 948 P.2d 627 (1997). As the State notes, a self-defense instruction is appropriate in a homicide case only if relevant evidence establishes that the defendant honestly and sincerely believed it would be necessary to employ deadly force in self-defense, and a reasonable person would have perceived the necessity of self-defense. K.S.A. 21-3211; see, *e.g.*, *Gonzalez*, 282 Kan. at 110.

To the extent Herron argues that the evidence supported a self-defense instruction here, he overstates. Neither in his statements to police nor anywhere else in the record did he or any other witness say that the Jacksons fired first or that there was any reasonable basis for Herron or the others in the van to believe it would be necessary to employ lethal force. What Herron did say was that the group pulled up to the house in a stolen vehicle; that the house was dark; that he did not see anyone in or around the house; and that he did not know where the first shot came from. The idea of self-defense was introduced in defense counsel's opening state-

ment and repeated in closing argument, but it remained merely theory without factual support. Other than the fact that Eric was known to be armed, there was no evidence that Herron or the rest of the group could have harbored either a subjective belief or an objectively reasonable belief in the necessity of deadly force to defend against an imminent attack. In this situation, no instruction on self-defense was warranted. See *Bell*, 276 Kan. at 793.

## Lesser Included Offense Instructions

Herron also claims that the district judge erred in failing to instruct the jury on lesser included offenses of voluntary and involuntary manslaughter. Again, these instructions were not requested. We thus review the omission for clear error.

As argued by Herron, he was entitled to these instructions because of the possibility the jury could have concluded he engaged in imperfect or failed self-defense. If the jury concluded that he aided and abetted the shooters in their honest but mistaken belief that use of deadly force was necessary, he should have been found guilty only of voluntary manslaughter. If the jury concluded that the belief in the necessity of deadly force was not mistaken but that the course of action based on that belief was unlawful, he should have been guilty only of involuntary manslaughter.

We have already held that the evidence in this case could not support a self-defense instruction. It also could not support a lesser included instruction built on a theory of imperfect or failed self-defense. On the facts proved at trial, a jury could not reasonably have convicted Herron of either voluntary or involuntary manslaughter. *State v. Calvin*, 279 Kan. 193, 202-03, 105 P.3d 710 (2005).

Affirmed.