NOT DESIGNATED FOR PUBLICATION

No. 112,128

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DAVID WASYLK,
*Appellant.*

MEMORANDUM OPINION

Appeal from Lyon District Court; MERLIN G. WHEELER, judge. Opinion filed November 6, 2015. Affirmed.

*Peter M. Maharry*, of Kansas Appellate Defender Office, for appellant.

*Amy L. Aranda*, assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., MCANANY and BUSER, JJ.

*Per Curiam*: When Michelle Hernandez-Corea was arrested for selling methamphetamine, she told police that she and Wesley Gohring had been making methamphetamine at a farm owned by David Wasylk. Based on this interview, the Emporia police got a warrant and searched Wasylk's property. The officers discovered a laundry list of items commonly associated with the manufacture of methamphetamine. Wasylk maintained at trial that he didn't know that Hernandez-Corea and Gohring were making methamphetamine at his farm, but the jury convicted him on all counts, including four counts of manufacturing methamphetamine.

Wasylk raises six issues on appeal, but as we summarize here, none of them require reversal:

- First, Wasylk argues that the evidence obtained at his farm should have been suppressed because the district court erred when it found that the officers executing the search warrant did so in good faith, even though their warrant was invalid. But the warrant wasn't obviously lacking probable cause, so the officers' good-faith reliance on the warrant was reasonable.

- Second, Wasylk argues that including the word "knowingly" in the jury instructions could have confused the jury and led it to convict him based on something less than the intentional behavior required for aiding and abetting. But while aiding and abetting must be done intentionally and manufacturing methamphetamine may be done either intentionally or knowingly, the instructions were sufficiently clear and accurate so that the jury could not reasonably have been misled.

- Third, Wasylk claims it was clear and reversible error for the judge to instruct the jury on the burden of a retrial. But the Kansas Supreme Court has ruled that such an instruction is not error when given as a preliminary instruction urging jurors not to commit misconduct during the trial.

- Fourth, Wasylk argues that his convictions are multiplicitous: he claims he is being punished multiple times for the same crime. But the evidence showed multiple criminal acts that took place over a month-long period, so his convictions don't arise from the same conduct and cannot be multiplicitous.

- Fifth, Wasylk claims the district court erred by admitting a series of text messages between his phone number and Gohring's phone. But the messages are not hearsay, as he contends—they didn't discuss manufacturing methamphetamine and were only admitted to show that a relationship existed between Wasylk and the people making methamphetamine at his farm.

- Last, Wasylk claims that these errors add up to cumulative error, but there was at most a single error here (regarding the burden-of-retrial jury instruction), and errors cannot accumulate unless there is more than one.

FACTUAL AND PROCEDURAL BACKGROUND

On August 12 and 13, 2013, Emporia police officers arranged two controlled purchases of methamphetamine through Quenton Criqui, who was cooperating with police. The facts surrounding these two controlled purchases are not in dispute. Both times, Criqui wore a wire, used recorded money, and bought methamphetamine from Wesley Gohring and Michelle Hernandez-Corea.

During the first purchase, on August 12, Gohring and Hernandez-Corea indicated that the methamphetamine was "fresh," meaning recently made, and they discussed making methamphetamine, specifically the "one-pot" or "shake and bake" method. Gohring told Criqui that he would have a new batch of methamphetamine the next day, and Criqui made plans to return on August 13. Criqui returned as planned and purchased two different kinds of methamphetamine, the "anhydrous" kind and what he considered the "normal" kind. During the second purchase, Gohring asked Criqui to buy pills for Gohring to use to make more methamphetamine.

Based on these purchases, Emporia police officers obtained a warrant for Hernandez-Corea's apartment, where the sales had taken place. The officers found methamphetamine, a black trash bag filled with items associated with making methamphetamine, other drug paraphernalia, and two cell phones later identified as belonging to Gohring and Hernandez-Corea. The officers arrested Gohring and Hernandez-Corea, and three officers interviewed Hernandez-Corea. Hernandez-Corea's interview formed the basis for a search warrant for David Wasylk's property. That search yielded a long list of items associated with making methamphetamine.

3

Based on the theory that Wasylk had aided and abetted Gohring's manufacturing activities at his farm, the State charged Wasylk with seven counts of manufacturing methamphetamine; possession of lithium metal or anhydrous ammonia with intent to manufacture a controlled substance; possession of drug paraphernalia with the intent to manufacture a controlled substance; and possession of anhydrous ammonia in an unapproved container. Wasylk filed a motion to suppress the evidence found at his property, arguing that the officers left out important details in the warrant application and that the warrant was not specific enough. At the hearing on the motion to suppress, the three officers who interviewed Hernandez-Corea testified, Wasylk testified, and the video of Hernandez-Corea's interview was shown to the court.

The substance of the interview with Hernandez-Corea is not disputed. She told the officers that Gohring had been selling methamphetamine from her Emporia apartment and described the sale to Criqui earlier in the day. Hernandez-Corea described a rural property north of Emporia where Gohring had been manufacturing methamphetamine. She was able to describe in detail the directions to get there, and one officer familiar with the area recognized her description. That officer asked Hernandez-Corea if it was the "Dave Wasylk farm," and she confirmed that it was. Hernandez-Corea accurately described the buildings located on the Wasylk farm, including the two-story white farmhouse with a trailer behind it. Hernandez-Corea told officers that she had been to the farm several times since mid-July 2013 with Gohring while he was manufacturing methamphetamine in a trailer. She said that Gohring had taken her food processor out to the farm to grind up pills. Hernandez-Corea told the officers that Gohring had gone out to the farm around 1:30 or 2:00 in the morning on August 13 and had returned around 9:30 with the methamphetamine that he sold to Criqui later that day. Hernandez-Corea also said that Gohring had told her that he had stolen anhydrous ammonia and was keeping it in a cooler at the farm.

4

The parties focused on three points at the suppression hearing: (1) the address on the search warrant, which had an error in it; (2) the fact that Hernandez-Corea was under the influence of drugs during her interview; and (3) whether Hernandez-Corea's information was sufficiently corroborated. The search warrant listed the farm address as "2223 Road H5, *Emporia*, Kansas," but the correct address is 2223 Road H5, *Americus*, Kansas. (Emphasis added.) The district court found that the distinction between the two addresses did not affect the validity of the search warrant, because it was a rural address and it was undisputed that "2223 Road H5" was the only such address in Lyon County. Next, the warrant application did not disclose that Hernandez-Corea was under the influence of methamphetamine during her interview. But based on the interview video, the district court found that the omission was not material because Hernandez-Corea, while she appeared nervous, did not have difficulty understanding or answering the officers' questions. Finally, the district court found that under *State v. Landis*, 37 Kan. App. 2d 409, 419, 156 P.3d 675, *rev. denied* 284 Kan. 949 (2007), the warrant was invalid because the officers failed to sufficiently corroborate Hernandez-Corea's statements; as an informant under arrest, she was seeking leniency, so her statements were not inherently reliable. However, the district court found that the officers carried out the warrant in good faith, so the evidence was not suppressed even though the warrant was technically invalid.

At trial, Hernandez-Corea testified about her dealings with Gohring and Wasylk. She said that Gohring arrived at her apartment in Emporia in the second week of July 2013 and that she let him live with her. A pretrial officer testified that Gohring was released on bond on July 10, 2013. Hernandez-Corea stated that on the night Gohring arrived, they used methamphetamine and then drove to the Wasylk farm; on the way, they stopped in a remote location to pick up a Swiss Army backpack filled with items needed to make methamphetamine. Hernandez-Corea testified that Wasylk arrived the next day and turned on the water in the trailer for them. While he was there, Wasylk asked Hernandez-Corea if the methamphetamine was done. Gohring and Hernandez-

5

Corea left the trailer for a few hours and returned that evening. Hernandez-Corea said that Wasylk was there when they returned and that Wasylk and Gohring spoke alone inside the trailer. After Wasylk left, Gohring made methamphetamine while Hernandez-Corea watched the road.

Hernandez-Corea said that she visited the Wasylk farm with Gohring three or four times and that she had seen Gohring making "shake and bake" methamphetamine at the farm at least twice. Hernandez-Corea testified that Wasylk showed up at the property on most of the days that she was there with Gohring. On one occasion, Wasylk told Hernandez-Corea that he thought she and Gohring were still safe on his farm. Hernandez-Corea also testified that Gohring took her food processor to the farm to grind up pseudoephedrine pills to make methamphetamine, that she brought pills to Gohring for that purpose, and that she saw Wasylk bring pills on one occasion as well. A pharmacy manager testified that his records showed that Wasylk purchased pseudoephedrine on July 19, 2013. Hernandez-Corea testified that on the night of August 13, Gohring left her Emporia apartment around 1:30 or 2:00 in the morning and returned at 9:30, muddy and covered in weeds, with methamphetamine and a black trash bag. She believed he had been making methamphetamine at the Wasylk farm.

Detective Travis Mishler testified about the items found at the Wasylk farm that were associated with making methamphetamine: lithium batteries, drain cleaner, six 2-liter plastic bottles with residue inside, plastic tubing, ammonium nitrate cold packs, a food processor, black electrical tape, Coleman camping fuel, wire cutters, starting fluid cans, coffee filters, pseudoephedrine boxes, rock salt, a Swiss Army backpack, and syringes. Mishler, who had been trained in how methamphetamine is manufactured, testified that among these items were six gassing generators. He testified that a person making methamphetamine needs one gassing generator for each batch to complete the process, so he concluded methamphetamine had been made at least six times.

6

Detective Kevin Shireman testified about his examination of the cell phones recovered from Hernandez-Corea's apartment. One phone belonged to Hernandez-Corea and one to Gohring. Hernandez-Corea's phone did not contain any texts with Wasylk, but Gohring's did. Shireman testified that he spoke with someone who had provided a possible phone number for Wasylk. Shireman examined the phone belonging to Gohring and found that phone number listed for a contact named "D.D." Shireman testified that he knew Wasylk went by the nickname "Dugout Dave." Misty Landis, who has children with Wasylk, also testified that the number was Wasylk's. Shireman then located a number of text messages sent and received between Gohring's phone and Wasylk's number (as well as texts between Gohring and Hernandez-Corea). Over Wasylk's objection on hearsay and foundation grounds, Shireman testified about the content of these texts; none of them mentioned manufacturing methamphetamine either directly or by any known slang terms.

At the close of the State's evidence, the district court dismissed three of the seven counts of manufacturing methamphetamine as unsupported by the evidence, even in a light most favorable to the State. (Mishler had testified about six gassing generators, and Hernandez-Corea testified about being at the farm three or four times.)

At the conference on jury instructions, the defense requested and received this addition to the instruction on aiding and abetting, based on prior Kansas cases recommending the addition: "Mere association with a person who actually commits a crime or mere presence in the vicinity of the crime is itself insufficient to establish guilt. Guilt is established when a person knowingly associates with an illegal venture and participates in a way that demonstrates willful furtherance of its success." The defense also asked to change the word "knowingly" to "intentionally," arguing that it confused the state of mind required for aiding and abetting, but the district court refused. For the same reason, the defense objected to the inclusion of the definition of "knowingly" in the

7

instruction on the state of mind required for manufacturing methamphetamine, but the district court again refused to modify the instruction.

The jury found Wasylk guilty on all counts. Wasylk filed a motion to depart from the standard sentence, arguing that he was not the principal actor, had a supportive family, and had a longstanding employment history. The district court denied Wasylk's motion and sentenced him to a guidelines sentence totaling 308 months in prison with 36 months of postrelease supervision. Wasylk has appealed to this court.

ANALYSIS

I. *Evidence Obtained Through the Invalid Search Warrant Was Still Admissible Under the Good-Faith Exception to the Exclusionary Rule.*

The district court found that the search warrant was invalid but that the evidence obtained through it was still admissible under the good-faith exception to the exclusionary rule. On appeal, Wasylk argues that the good-faith exception should not have been applied. The State argues that the good-faith exception does apply, but in doing so the State also appears to challenge the district court's initial determination that the warrant was invalid. In reply, Wasylk claims that because the State did not file a separate cross-appeal, it cannot now challenge whether the warrant was valid and supported by probable cause.

K.S.A. 2014 Supp. 60-2103(h) governs Kansas appellate procedure regarding cross-appeals: "When notice of appeal has been served in a case and the appellee desires to have a review of *rulings and decisions* of which such appellee complains, the appellee shall . . . give notice of such appellee's cross-appeal." (Emphasis added.) The Kansas Supreme Court has interpreted this provision to mean that if the appellee does not file a cross-appeal to challenge adverse rulings, then those rulings are not properly before the

8

appellate court and may not be considered. *Cooke v. Gillespie*, 285 Kan. 748, Syl. ¶ 2, 176 P.3d 144 (2008). The statute was designed to avoid piecemeal appeals and to facilitate addressing all issues in a single appeal. 285 Kan. at 754-55 (applying the cross-appeal statute in a civil case that had been ongoing for 20 years). Of course, judicial efficiency is not a great concern here because the State has raised all of its arguments in the same appeal.

But Wasylk cites *State v. Novotny*, 297 Kan. 1174, 307 P.3d 1278 (2013), where the court applied K.S.A. 2014 Supp. 60-2103(h) and determined that one of the State's arguments was not properly before the court. We find *Novotny* applicable here.

In *Novotny*, the district court found that a photo lineup was unnecessarily suggestive but admitted the evidence anyway because there was no substantial likelihood of misidentification. 297 Kan. at 1181. On appeal, the State ignored the district court's reasoning (which had led to a good result for the State) and argued, as it had below, that the lineup wasn't unnecessarily suggestive. In other words, the State agreed that the evidence should have been admitted but for a different reason than the district court used. The Kansas Supreme Court said the State's challenge to the district court's initial determination that the lineup was unnecessarily suggestive wasn't properly before the court, but then it affirmed the district court's decision and reasoning; the State's argument was rejected, but the evidence was still admissible. 297 Kan. at 1181. Here, the State purports to argue that the good-faith exception was correctly applied, but the substance of the State's brief includes the argument that the warrant was valid and supported by probable cause. So as in *Novotny*, the State argues that the evidence was properly admitted but for a different reason than the one given by the district court.

Applying K.S.A. 2014 Supp. 60-2103(h) and following *Novotny*, we find that the State's challenge to the warrant's validity is not properly before the court because the State did not file a cross-appeal. However, this determination does not end the matter: the

9

State's arguments regarding probable cause and the warrant's validity remain highly relevant to the analysis of the good-faith exception, where we must consider whether the officers could have *reasonably relied* on the warrant's validity. See *United States v. Leon*, 468 U.S. 897, 925, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) (stating that it frequently will be difficult to determine whether officers acted reasonably without discussing probable cause); *State v. Powell*, 299 Kan. 690, 695, 325 P.3d 1162 (2014); *State v. Althaus*, 49 Kan. App. 2d 210, 218, 305 P.3d 716 (2013) (discussing probable cause as a baseline for whether an officer's reliance on a warrant was reasonable). If a strong argument is available that the warrant actually was valid—even though we may not reach that issue without a cross-appeal from the State—then the case for the officers' reasonable reliance may be a strong one too.

Let's turn now to the background legal principles that guide our review. The Fourth Amendment to the United States Constitution protects us from unreasonable searches and seizures, and the Kansas Constitution provides identical protection. *Powell*, 299 Kan. at 694. When police officers obtain evidence illegally, in violation of this protection, that evidence may not be used at trial—this is known as the exclusionary rule. *Powell*, 299 Kan. at 694-95; *Althaus*, 49 Kan. App. 2d at 219. The exclusionary rule was designed by courts to deter police officers from violating people's Fourth Amendment rights: if police perform an unconstitutional search, they cannot use any of the discovered evidence against a defendant at trial. *Leon*, 468 U.S. at 906-07; *Powell*, 299 Kan. at 694-95.

But there is some leeway when a search warrant—issued by a judge or magistrate—turns out to be invalid. We want to encourage law-enforcement officers to obtain warrants whenever possible rather than to rely on exceptions to the warrant requirement. See *Leon*, 468 U.S. at 914 (noting "strong preference for warrants"). That's because a warrant requires the separate approval of the search from a neutral judge or magistrate, a valuable check on law enforcement. Accordingly, we do not apply the

10

exclusionary rule every time a warrant turns out to have been invalid. Rather, the exclusionary rule is applied *only* if the officers' reliance on the warrant was *unreasonable*. *Leon*, 468 U.S. at 913. This good-faith exception to the exclusionary rule encourages police officers to get search warrants, thereby placing the neutral magistrate in between officers' investigatory goals and the people's Fourth Amendment rights. See *Leon*, 468 U.S. at 913, 920-21. Under this good-faith exception, when the existence of probable cause is a close call, officers can rely on a magistrate's decision, even if it's later overturned. See *Leon* 468 U.S. at 920-21.

Whether a court has correctly construed the good-faith exception is a question of law, so we must review that question independently, without any required deference to the district court. *State v. Hoeck*, 284 Kan. 441, 447-48, 163 P.3d 252 (2007); *Althaus*, 49 Kan. App. 2d at 217. There are four circumstances in which the good-faith exception does not apply (exceptions to the exception): (1) the magistrate who issued the warrant was deliberately misled; (2) the magistrate wholly abandoned his or her neutral role; (3) there was so little indication of probable cause in the affidavit that it was unreasonable for the officers to believe the warrant was valid; and (4) the warrant was not specific enough for officers to determine the place to be searched or items to be seized. *Powell*, 299 Kan. at 700 (citing *Leon*, 468 U.S. at 923). These kinds of circumstances should not occur often. *Althaus*, 49 Kan. App. 2d at 222.

Here, the district court reviewed each of these circumstances, found that none of them were implicated, and applied the good-faith exception. Wasylk claims that it was unreasonable for the officers to rely on the warrant because it was so obviously lacking in probable cause—the third exception to the exception.

When looking at whether the officers' reliance on a warrant was reasonable, this court must determine "'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *Powell*, 299 Kan. at 701

11

(quoting *Leon*, 468 U.S. at 922 n.23). This standard, while objective, defers to the police officers acting under a search warrant. *Althaus*, 49 Kan. App. 2d at 217, 222, 225; see *Powell*, 299 Kan. at 701 ("The threshold to avoid the *Leon* good-faith exception is a high one."). The question is not whether the magistrate judge was wrong in believing there was probable cause to grant the warrant; instead, the question is whether that magistrate judge's determination was "'so obviously'" wrong that "'any reasonable officer would have recognized the error.'" *Powell*, 299 Kan. at 699 (quoting *Messerschmidt v. Millender*, 565 U.S. ___, 132 S. Ct. 1235, 1250, 182 L. Ed. 2d 47 [2012]); see also *Althaus*, 49 Kan. App. 2d at 225. To answer this question, we look to the affidavit as a whole. *Powell*, 299 Kan. at 701. Because the specific issue is whether the affidavit contained so little indication of probable cause that it was unreasonable for the officers to believe the warrant was valid, the court should also keep in mind what is required for probable cause: specific facts that lead a reasonable person to conclude that evidence of a crime may be found in a particular place. *Althaus*, 49 Kan. App. 2d at 223.

The district court relied on *State v. Landis*, 37 Kan. App. 2d 409, 419, 156 P.3d 675, *rev. denied* 284 Kan. 949 (2007), to find that the warrant was invalid because it was based on uncorroborated information from an individual (Hernandez-Corea) who had been involved in criminal activity and was seeking leniency. The State argues here that police did not need to corroborate her statements. As discussed earlier, we cannot reconsider the precise question of whether corroboration was necessary: the lack of corroboration was the reason the district court determined that the warrant was invalid, and the State hasn't properly challenged that determination by cross-appeal.

Even so, the State's discussion of the corroboration issue is instructive in determining whether the officers' reliance on the warrant was reasonable. As the United States Supreme court said in *Leon*, "[I]t frequently will be difficult to determine whether the officers acted reasonably without resolving the Fourth Amendment issue." 468 U.S. at 925.

12

It is well established that when a warrant affidavit is based on anonymous tips, police officers must corroborate the tips or give specific facts showing that the informant was truthful and reliable. *Powell*, 299 Kan. at 698, 703. On the other hand, information from named informants usually is considered reliable without corroboration. *State v. Musick*, 30 Kan. App. 2d 76, 78, 38 P.3d 144, *rev. denied* 273 Kan. 1039 (2002). But when a named informant is a participant in the crime and gives information in the hope of leniency, the presumption of reliability doesn't apply, and officers must corroborate the information or otherwise demonstrate the informant's truthfulness and reliability. *Landis*, 37 Kan. App. 2d at 419. Further, corroboration of the defendant's address alone is insufficient to establish the truthfulness or reliability of the informant. 37 Kan. App. 2d at 419.

Two cases are the focus of our consideration—*Landis* and our Supreme Court's later ruling in *State v. Adams*, 294 Kan. 171, 273 P.3d 718 (2012).

The informant in *Landis* was arrested during a traffic stop after the officer discovered marijuana in her car. After changing her story a couple of times, the informant eventually said that she had purchased the marijuana from Landis; based on that statement, officers obtained a search warrant for Landis' residence. The Court of Appeals determined that the informant's uncorroborated statement was insufficient for probable cause. 37 Kan. App. 2d at 420.

In *Adams*, as in *Landis*, the court dealt with a named informant who had been a participant in the crime and who had made statements in the hope of leniency, but the *Adams* court came to a different result. 294 Kan. at 181-82. The *Adams* informant was arrested during a traffic stop when an officer determined she was intoxicated. Based on her statements that she had purchased materials to make methamphetamine and that those items were at her home, the officers obtained a search warrant. Adams lived with the

13

informant; he was arrested during the execution of the search warrant and charged with methamphetamine crimes.

The *Adams* court distinguished *Landis*: there, the informant "merely point[ed] a finger in the direction of a tenuous third party," whereas in *Adams*, the informant "was leading the officers to evidence that had the potential of fortifying or adding to charges the State could bring against her." 294 Kan. at 182; see also *State v. Howell*, No. 109,805, 2013 WL 6168474, at *4 (Kan. App. 2013) (unpublished opinion) (citing *Adams* to find that a named informant who voluntarily gave information that potentially implicated his wife was reliable because he was not "pointing a finger at a tenuous third party"). The *Adams* court found that the circumstances suggested truthfulness and reliability and did not require corroboration. 294 Kan. at 182.

The facts in our case fall somewhere in between *Landis* and *Adams*: the informant in *Adams* gave information that directed the officers to the informant's own home and further implicated her in criminal activity; Hernandez-Corea gave information that, while it did further implicate her in criminal activity, directed officers to someone else's (Wasylk's) property. But Hernandez-Corea's statements appear more detailed than the information provided by the *Landis* informant. As we have explained, however, the question before this court is not whether the affidavit provided probable cause sufficient to issue a warrant—the district court determined that it did not, and we are not free to reconsider that ruling. The question is whether it was reasonable for the officers to rely on the warrant.

Wasylk accurately states that well-trained officers acting in good faith will take care to learn what Fourth Amendment precedent requires and will conform their conduct to these rules. *Davis v. United States*, 564 U.S. ___, 131 S. Ct. 2419, 2429, 180 L. Ed. 2d 285 (2011). Wasylk argues that *Landis* is binding precedent that the officers should have known about; therefore, it was unreasonable for the officers to rely on a warrant that

14

lacked corroboration of statements made by an unreliable informant. However, *Landis'* precedential value is less clear than Wasylk suggests. First, the specific issue here, the reliability of informants, is a fact-specific inquiry rather than a settled rule of law. See *Illinois v. Gates*, 462 U.S. 213, 231-32, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) (the probative value of a tip is determined using the totality of the circumstances); compare *Landis*, 37 Kan. App. 2d at 418-20, with *Adams*, 294 Kan. at 181-82. The law requiring corroboration of anonymous tips is clear; the law regarding the reliability of named and voluntary citizen-informants seems likewise established. See *State v. Hendricks*, 31 Kan. App. 2d 138, 143, 61 P.3d 722 (2003). But informants who participated in the crime and are hoping for leniency are in a different category, and the reliability of their statements depends on their particular circumstances, as shown by the differing results in *Landis* and *Adams*. Second, binding precedent in Kansas is generally that of the Kansas Supreme Court or, at the federal level, either the United States Supreme Court or the United States Court of Appeals for the Tenth Circuit. See *State v. Karson*, 44 Kan. App. 2d 306, Syl., 235 P.3d 1260 (2010), *aff'd on other grounds* 297 Kan. 634, 304 P.3d 317 (2013). We do not find that *Landis* was such well-established precedent that the officers were acting in bad faith by executing a warrant that did not comply with it.

Further, the affidavit is not so lacking in evidence of probable cause that it was unreasonable for the officers to rely on it. Hernandez-Corea, while not the ideal informant, was an identified informant and therefore more reliable than someone making an anonymous tip. See *Powell*, 299 Kan. at 702. Her motives may have included a hope for leniency, but that merely undercuts and does not destroy her credibility. See *State v. Hensley*, 298 Kan. 422, 432, 313 P.3d 814 (2013) ("An informant's unexpressed, questionable motives do not necessarily prohibit reliance on information that informant supplies."). Importantly, the affidavit does not contain any deliberate omissions, like the affidavit in *Landis* did. The district court in our case specifically concluded that Wasylk did not have to show any deliberate and material omissions from the affidavit, while in *Landis* our court noted that the officer had deliberately omitted the informant's multiple

15

changes to her story. *Landis*, 37 Kan. App. 2d at 423; see also *Hendricks*, 31 Kan. App. 2d at 145 (declining to apply the good-faith exception because of officer's deliberate omission of details concerning informant's veracity). Finally, the affidavit and warrant did not have any glaring deficiencies, such as failing to state which items were to be seized. See *Powell*, 299 Kan. at 702.

In *Davis*, the United States Supreme Court stated that it had "'never applied' the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct." 131 S. Ct. at 2429 (quoting *State v. Herring*, 555 U.S. 135, 144, 129 S. Ct. 695, 172 L. Ed. 2d 496 [2009]). The purpose of the exclusionary rule is to discourage unconstitutional police practices, a goal that would not be served here: nothing in the record suggests that the police officers in this case did anything untoward. We agree with the district court that the evidence was admissible under the good-faith exception to the exclusionary rule.

II. *The District Court's Jury Instructions on Criminal Liability for Aiding and Abetting Were Not in Error.*

Wasylk argues that the district court improperly instructed the jury regarding the necessary intent of an aider and abettor because two of the instructions say Wasylk must have committed the crime "knowingly," while the crime of aiding and abetting requires more than that—it requires specific intent to commit the crime. At trial, Wasylk objected to the state-of-mind elements of the instructions on aiding and abetting and manufacturing methamphetamine. Since Wasylk objected, we go on to consider whether the court's instruction was legally correct and, if not, we judge whether the error was harmless by asking whether there is a reasonable probability that the error affected the trial's outcome in light of the entire record. *State v. Bolze-Sann*, 302 Kan. ___, ___, 352 P.3d 511, 522 (2015); *State v. Salary*, 301 Kan. 586, 592, 599, 343 P.3d 1165 (2015).

16

The harmless-error test we have just noted applies when the defendant claims the violation of a statutory, not a constitutional, right. See *Salary*, 301 Kan. at 599; *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011). Here, the defendant has argued that the court's instructions were contrary to Kansas criminal statutes regarding the level of mental culpability required, not in violation of some constitutional right. So we look to see whether the instructions accurately stated the law and whether there is a reasonable probability that they misled the jury. We look at the instructions as a whole, without focusing on any single instruction, to determine whether they fairly state the law or whether it is reasonable to conclude that they may have misled the jury. *State v. Hilt*, 299 Kan. 176, 184-85, 322 P.3d 367 (2014).

The aiding-and-abetting instruction given by the district court consisted of five sentences (as shown below with numbering added):

"[1] A person is criminally responsible for a crime if the person, either before or during its commission, and with the mental culpability required to commit the crime, intentionally aids another to commit the crime.

"[2] Mere association with a person who actually commits a crime or mere presence in the vicinity of the crime is itself insufficient to establish guilt. [3] Guilt is established when a person knowingly associates with an illegal venture and participates in a way that demonstrates willful furtherance of its success. [4] The State must prove that the defendant committed the charged crimes intentionally.

"[5] A defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about by the State or to cause the result complained about by the State."

The first sentence has been approved by our Supreme Court in *State v. Soto*, 299 Kan. 102, 112, 322 P.3d 334 (2014). The second sentence—helpful to the defense—also has been approved. See *State v. Llamas*, 298 Kan. 246, 260-61, 311 P.3d 399 (2013); see

17

also Notes on Use, PIK Crim. 4th 52.140. The fourth and fifth sentences require intentional conduct and explain that term; Wasylk argues that intentional conduct is required, and he does not object to these sentences.

So Wasylk's complaint revolves around the third sentence. It was based on our Supreme Court's statement in *State v. Herron*, 286 Kan. 959, Syl. ¶ 5, 189 P.3d 1173 (2008): "[W]hen a person knowingly associates with an unlawful venture and participates in a way that demonstrates willful furtherance of its success, guilt as an aider and abettor is established." The third sentence is virtually identical to that statement from *Herron*, but Wasylk notes that *Herron* predates the 2010 recodification of the Kansas Criminal Code, which is when the term "knowingly" first became a part of the statute on culpable mental states, K.S.A. 2014 Supp. 21-5202. See L. 2010, ch. 136, sec. 13 (effective July 1, 2011).

As applied in our case, though, we see no error in the district court's use of the *Herron* language. While the sentence begins by saying that "[g]uilt is established when a person *knowingly associates* with [the] illegal venture," it then adds that the participation must "demonstrate[] *willful furtherance* of its success." (Emphasis added.) Willful conduct is voluntary and intentional. Black's Law Dictionary 1834 (10th ed. 2014); see PIK Crim. 3d 54.01-A ("Intentional means willful and purposeful and not accidental."). In context, the aiding-and-abetting instruction told the jury that Wasylk's conduct in this case had to be intentional—a willful furtherance of the success of the venture. And the venture at issue was the manufacture of methamphetamine.

Wasylk rightly points out that we must consider two other instructions to determine if the district court erred in giving them. One instruction told the jury that the defendant's manufacture of methamphetamine must be done "intentionally or knowingly." The other was a standard instruction—PIK Crim. 4th 52.010—defining the terms "intentionally" and "knowingly." The definitions were accurately stated, and the underlying crime of manufacture of methamphetamine can, by statute, be committed

18

either knowingly or intentionally. K.S.A. 2014 Supp. 21-5703(a) makes it unlawful to manufacture controlled substances, including methamphetamine, but that statute does not set out the mental state required to commit that crime. Accordingly, intentional, knowing, or even reckless conduct would suffice, see K.S.A. 2014 Supp. 21-5202(d), (e), though the district court instructed the jury only on intentional or knowing conduct.

We have already looked at the instruction on aiding and abetting and found nothing in error there. Our question now is whether the addition of these two instructions changes the result.

At least in this case, we think not. Wasylk wasn't charged as the principal actor who made methamphetamine; he was charged as an aider and abettor. It might have been better practice in this case to have instructed the jury only as to intentional conduct. But the instruction on aiding and abetting specifically referenced intentional conduct three times. And the only reference there to knowing conduct was to being knowingly associated with a venture "in a way that demonstrates willful furtherance of its success."

Similarly, it's hard to conjure up a way in which Wasylk could have *knowingly* assisted here without *intending* that methamphetamine be manufactured. The State presented evidence that Wasylk bought pseudoephedrine during the time period that Hernandez-Corea and Gohring were making methamphetamine on his farm. Hernandez-Corea testified that Wasylk showed up at the property on most of the days she was there with Gohring to make methamphetamine, that she saw Wasylk bring pills for the process on one occasion, and that Wasylk once asked her whether the methamphetamine was done. In sum, we find no error here when the instructions, taken as a whole, are applied to the evidence presented. And even if it was error to include a discussion of knowing conduct in the jury instructions, we would find no reasonable probability that the error would have affected the trial's outcome. See *Salary*, 301 Kan. at 601-02 (finding error in declining to give lesser-included-offense instruction asserting self-defense harmless in

19

light of strong evidence of premeditation and weak evidence of honest belief of need to employ deadly force).

III. *The District Court's Explanation to the Jury That a Burdensome Retrial Might Be Required if Jurors Didn't Follow the Judge's Instructions as to Behavior During the Trial Was Not Clearly Erroneous.*

Wasylk next argues that the district court improperly instructed the jury about the burden of a retrial. The comments came in the district judge's opening remarks to jurors about their duty not to engage in activity that could unfairly affect consideration of the case:

> "You must not engage in any activity or be exposed to any information that might unfairly affect the outcome of this case. Any juror who violates these restrictions I have explained to you jeopardizes the fairness of these proceedings and a mistrial could result, that would require the entire trial process to start over. As you can imagine, a mistrial is a tremendous expense and inconvenience to the parties, the Court, and the taxpayers."

Wasylk did not object to this instruction at trial, and the parties agree that the court should review this issue for clear error. See K.S.A. 2014 Supp. 22-3414(3); *Bolze-Sann*, 352 P.3d at 520-21. When reviewing for clear error, we first determine whether there was any error at all, asking whether the instruction was legally and factually appropriate. *State v. Brown*, 300 Kan. 542, 554-55, 331 P.3d 781 (2014). If there was error, it is only reversible (or a "clear error") if this court is firmly convinced that the jury would have reached a different result if the error hadn't occurred. 300 Kan. at 555.

In a different context, the Kansas Supreme Court has previously held that giving the instruction regarding the burden of a retrial is error. Specifically, a pattern Kansas jury instruction previously told jurors that "[a]nother trial would be a burden on both sides" in the context of telling jurors what would happen if they failed to reach a decision.

20

In that context, our Supreme Court held in *State v. Salts*, 288 Kan. 263, 266, 200 P.3d 464 (2009), that giving this instruction was in error. But the court also noted that it had never found the use of such an instruction to require reversal of a jury verdict, 288 Kan. at 266, and it found no clear error in the *Salts* case, either. 288 Kan. at 266-67.

Here, however, the court gave the burden-of-retrial instruction while telling jurors to follow the court's instructions *during* the trial; it was not commenting about deliberations in a way that could be seen as pressuring jurors to give up their own views about the case in order to reach a verdict and avoid retrial. In the context at issue in our case, our Supreme Court has determined that an instruction virtually identical to the one given in Wasylk's case was factually and legally accurate and thus not given in error. *State v. Tahah*, 302 Kan. ___, Syl. ¶ 6, ___ P.3d ___ (No. 109,857, filed October 2, 2015). The district court did not err in giving this instruction in Wasylk's case, either.

IV. *Wasylk's Convictions Were Not Multiplicitous in Violation of Double Jeopardy.*

Wasylk next argues that he was improperly convicted of multiplicitous charges for the manufacture of methamphetamine. We review this issue independently, without any required deference to the district court. *State v. Thompson*, 287 Kan. 238, 243, 200 P.3d 22 (2009); *State v. Schoonover*, 281 Kan. 453, 462, 133 P.3d 48 (2006).

Multiplicity is the charging of a single offense in more than one count. *State v. Pham*, 281 Kan. 1227, 1246, 136 P.3d 919 (2006). That can be problematic because of the potential for multiple punishments for a single offense in violation of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10 of the Kansas Constitution Bill of Rights. 281 Kan. at 1246.

In *Schoonover*, the Kansas Supreme Court performed an extensive historical review of double-jeopardy cases, both federal and state, and set forth an analytical

21

framework for multiplicity questions. 281 Kan. at 496. First, the court asks whether the multiple charges arise from the same conduct, considering factors including: "(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." 281 Kan. at 497. If the acts do arise from the same conduct, the court then asks if, by statutory definition, there are two offenses or only one. 281 Kan. at 496-97. For cases like this one, with multiple convictions under a single statute, the court uses the unit-of-prosecution test. 281 Kan. at 497. The court looks at how the legislature has defined the conduct that comprises a single violation of the statute. 281 Kan. at 497-98. That conduct is a unit of prosecution, and a person can only be convicted once for each unit. 281 Kan. at 497-98. The key is the nature of conduct proscribed. 281 Kan. at 472.

We first consider whether Wasylk's charges arise from the same conduct, beginning with the four factors listed by the *Schoonover* court. 281 Kan. at 496-97.

First, the acts took place over a period of about a month, not at or near the same time. Hernandez-Corea testified that she was with Gohring at the Wasylk farm at least three or four times and that Wasylk stopped by almost daily. Hernandez-Corea stated that these trips occurred from mid-July 2013 until she and Gohring were arrested on August 13, 2013, and that the purpose of the trips was to cook methamphetamine. Wasylk bought pseudoephedrine, which can be used in the making of methamphetamine, on July 19. Criqui, the confidential informant who twice purchased methamphetamine from Gohring and Hernandez-Corea, testified that when he made his first purchase on August 12, Gohring told him the methamphetamine was "fresh," meaning recently made. Criqui testified that Gohring told him that he would have a new batch of methamphetamine the next day. Hernandez-Corea testified that Gohring went to the Wasylk farm during the early morning hours of August 13 and returned to her house with more methamphetamine. During the second controlled buy, Criqui purchased two different

22

types of methamphetamine. Finally, Detective Mishler testified that he believed there had been six individual "cooks" of methamphetamine because he discovered six gassing generators at the Wasylk farm and he knew from his training and experience that a person uses one gassing generator each time he or she manufactures methamphetamine. Taken together, the evidence suggests that the manufacturing of methamphetamine at Wasylk's farm took place multiple times over a period of about a month.

Second, the evidence shows that the acts all took place more or less at the same location—in and around a trailer at Wasylk's farm. Third, we consider whether there is a causal relationship between the acts, in particular whether there was an intervening event. With several individual instances of manufacturing methamphetamine over approximately a month, there were several intervening events, including traveling to and from Wasylk's farm. Fourth, we consider whether there was a fresh impulse motivating some of the conduct. The controlled buys on August 12 and 13 demonstrate at least one possible fresh impulse—Gohring was making more methamphetamine to sell it to Criqui. And given that the events occurred over the course of a month, it's reasonable to assume there were other "fresh impulses."

Based on our consideration of these factors, we conclude that the conduct was not unitary and, therefore, that the charges against Wasylk were not multiplicitous. See *Schoonover*, 281 Kan. 496-97. Wasylk's case is easily distinguished from *Schoonover*, in which the court found unitary conduct supporting Schoonover's various methamphetamine convictions, including manufacturing. 281 Kan. at 498-99. There, Schoonover was arrested while sitting in a "rolling meth lab," or a vehicle that contained manufacturing paraphernalia. 281 Kan. at 498. Analyzing the relevant factors, the court found it could not conclude there were separate events: there was no evidence on the length of time this meth lab had been operational, there was no evidence of an intervening event in the production cycle, and there was no evidence of a "fresh criminal impulse of starting a new manufacturing process." 281 Kan. at 499; see also *State v.*

23

*Thompson*, 287 Kan. 238, 245, 200 P.3d 22 (2008) (finding unitary conduct where defendant was charged with possession of supplies with intent to manufacture methamphetamine and there was no evidence of length of time, intervening events, or fresh impulses). Here, the State presented evidence of separate manufacturing events that took place over a month-long period. This is not a case in which the manufacturing process was continuously ongoing. Evidence of different types of manufacturing processes (anhydrous and "shake and bake") and of different manufacturing events supports the conclusion that the conduct was not unitary.

V. *The District Court Did Not Err When It Admitted Various Text Messages.*

Wasylk next argues that the district court should not have admitted text messages from Gohring's cell phone because those texts were inadmissible hearsay. The State argues in response that the texts were not hearsay because they were not admitted for their truth. Wasylk objected at trial on foundation and hearsay grounds, but the district court admitted the text messages over Wasylk's objection, although it did not make any specific findings regarding admissibility.

When reviewing a district court's decision to admit evidence, this court's first step is to ask whether the evidence is relevant. *State v. Bowen*, 299 Kan. 339, 348, 323 P.3d 853 (2014); *State v. Franklin*, 280 Kan. 337, 340, 121 P.3d 447 (2005). Evidence is relevant if it has a "tendency in reason to prove any material fact." K.S.A. 60-401(b). Neither party contends that these text messages weren't relevant—the messages tend to show that Wasylk was in contact with the people who were manufacturing methamphetamine at his farm, which could support the inference that Wasylk was assisting them.

The second step is to consider the evidentiary rules governing admission and exclusion. These rules apply either as a matter of law or in the district judge's discretion,

24

depending on the rule, and the appellate court's standard of review will vary accordingly. *Bowen*, 299 Kan. at 348; *Franklin*, 280 Kan. at 340. Generally, for hearsay matters, this court reviews a district court's decision to admit or exclude evidence for an abuse of discretion. *State v. Betancourt*, 301 Kan. 282, 297, 342 P.3d 916 (2015). "There are three ways in which a trial court can abuse its discretion: (1) when no reasonable person would take the view adopted by the trial court; (2) when a ruling is based on an error of law; or (3) when substantial competent evidence does not support a trial court's findings of fact on which the exercise of discretion is based." 301 Kan. at 297. But because a district court always abuses its discretion when its decision is based on an error of law, we have unlimited review over whether a district court applied the correct legal standards when ruling on the admission or exclusion of evidence. *Boldridge v. State*, 289 Kan. 618, 633, 215 P.3d 585 (2009).

K.S.A. 2014 Supp. 60-460 defines hearsay as "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." Hearsay is not generally admissible unless it falls into one of the statutory exceptions. K.S.A. 2014 Supp. 60-460. But out-of-court statements that are not offered to prove the truth of the matter stated are not hearsay and are generally admissible. *Boldridge*, 289 Kan. 618, Syl. ¶ 12. For example, out-of-court statements that are not offered as true statements but circumstantially give rise to an indirect inference are generally admissible. *State v. McKissack*, 283 Kan. 721, 737, 156 P.3d 1249 (2007) (citing *State v. Oliphant*, 210 Kan. 451, 454, 502 P.2d 626 [1972]). In other words, an out-of-court statement is not hearsay and is admissible if the statement is not offered for its truth but is instead offered merely to show that the statement was made. 283 Kan. at 737.

Here, the State seized two cell phones during the search of Hernandez-Corea's apartment, and Detective Shireman testified about his examination of these phones. One phone belonged to Gohring and one to Hernandez-Corea. Hernandez-Corea's phone did

25

not contain any texts with Wasylk, but Gohring's did. Shireman testified about the content of these texts; none of them mentioned manufacturing methamphetamine either directly or by any known slang terms.

We agree with the State that these text messages were not hearsay because they were not admitted to prove the truth of their assertions. Shireman agreed with defense counsel that the texts were "vague" and didn't include any slang terms for manufacturing methamphetamine. A few of the texts sent to Wasylk are: "Did you get that?" "Your old lady just showed up out here," "Yeah, we figured," "Okay," "Fixing to leave," and "This poor dog needs tick meds badly, damn." The text message "Your old lady just showed up out here" was not introduced at trial to prove that Wasylk's "old lady" visited the farm. Nor was the dog's need for tick medicine under consideration. No text to or from Wasylk discusses manufacturing methamphetamine. If such a text existed, the truth of that text *would* matter, and it would be hearsay. But the truth of these texts was not the point of their introduction.

Instead, the State used these texts to show that Wasylk and Gohring were in contact with one another: the point was to show that the text messages were sent. See *McKissack*, 283 Kan. at 737 (statements not offered to prove the truth of the statements' content but rather to show that the statements were made). From there, the jury could infer a relationship between Gohring and Wasylk that may have included manufacturing methamphetamine. See *State v. Harris*, 259 Kan. 689, 699-700, 915 P.2d 758 (1996) (statement used circumstantially to give rise to an indirect inference rather than for its truth is not hearsay). Wasylk's brief claims that the "text messages in this case were introduced by the State to prove that Wasylk was manufacturing methamphetamine with Gohring," but the content of those text messages is wholly irrelevant to that purpose. The text messages were not hearsay because they were not offered for their truth, and the district court did not err in admitting them.

26

We affirm the district court's judgment.