IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 112,806

STATE OF KANSAS,
*Appellee*,

v.

JIMMY JERMAL NETHERLAND,
*Appellant*.

SYLLABUS BY THE COURT

1.

When sufficiency of the evidence is challenged in a criminal case, an appellate court's standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.

2.

In this case, testimony from four accomplices describing the defendant's involvement in crimes and other evidence was sufficient to support the defendant's convictions.

3.

An appellate court reviews a prosecutorial misconduct claim using a two-step analysis. First, the appellate court determines whether the prosecutor's comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. If the comments were improper and constituted misconduct, the appellate court must determine

whether the comments prejudiced the jury against the defendant and denied the defendant a fair trial. In the second step, the appellate court consider three factors: (1) whether the misconduct was gross and flagrant, (2) whether the misconduct showed ill will on the prosecutor's part, and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these factors is individually controlling. Before the third factor can ever override the first two factors, the appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), have been met. As a practical matter, however, if the constitutional harmless error test is met, the statutory test also will be met. Under the constitutional test, the party benefitting from the error must demonstrate beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record, *i.e.*, there is no reasonable possibility that the error contributed to the verdict.

4.

In this case, the prosecutor's statement to the jury in closing, "Now, [f]olks, if for a minute you believe the State somehow contrived" a letter alleged to have been sent by the defendant while in jail awaiting trial, "well, you have to acquit the defendant," was not prosecutorial misconduct outside the wide latitude allowed the State when discussing the evidence presented.

Appeal from Shawnee District Court; NANCY E. PARRISH, judge. Opinion filed September 30, 2016. Affirmed.

*Gerald E. Wells*, of Jerry Wells Attorney-at-Law, of Lawrence, argued the cause and was on the brief for appellant.

*Jodi E. Litfin*, assistant district attorney, argued the cause, and *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

2

The opinion of the court was delivered by

BEIER, J.: Defendant Jimmy Jermal Netherland challenges his convictions for first-degree felony murder, attempted aggravated robbery, aggravated robbery, conspiracy to commit aggravated robbery, aggravated battery, and attempted burglary of a motor vehicle. Most of the convictions relate to the murder of Topeka attorney Natalie Gibson.

Netherland asks this court to consider two issues on appeal: (1) Sufficiency of the evidence to support his convictions, and (2) prosecutorial misconduct.

We affirm Netherland's convictions.

FACTUAL AND PROCEDURAL BACKGROUND

Netherland's sufficiency challenge requires us to recite the facts underlying this appeal in greater detail than might otherwise be necessary. Because multiple participants in the events underlying this appeal share the same last name, this opinion will refer to these participants on second and subsequent reference by their first names.

*July 18, 2011—Attempted Burglary of a Motor Vehicle*

On July 18, 2011, Officers Matt Cobb and Kenneth Lawler were on foot patrol near an apartment complex in Topeka. They noticed two young males who appeared to be on lookout and a third young male circling cars in the parking lot. The officers remained hidden. The third man paused at a vehicle. Then the officers heard two loud bangs. At the sound, all three men ran directly toward Cobb and Lawler. The one who had been circling vehicles dropped a glove containing a rock; Cobb retrieved it. Lawler caught one of the two lookout men, and the man was later identified as DaQuan Wilkins.

3

The two others escaped. The owner of the vehicle the one man had been circling would later testify that he did not give the three men permission to enter his vehicle.

*July 21, 2011—Natalie Gibson's Murder*

Lori Allison and Natalie Gibson lived together in Topeka. July 20 was Gibson's 40th birthday, so the two spent the day celebrating. That evening they went to a local bar with nearly 50 friends. They left the bar about 12:30 a.m. Allison drove Gibson's truck, and she entered the alley behind their home so that she could park in a detached carport. Once parked, Allison got out and went to the backseat to gather Gibson's gifts.

When Allison turned around, a man was pointing a gun at her face from approximately 10 feet away. Allison would later testify that the gun was not a revolver. The man told Allison to turn around and put her hands on her head; he then demanded her money. She felt a hand go inside her pocket. The man took her ID, a credit card, and about $20 in cash.

Allison would testify that Gibson was still seated in the passenger seat of the truck. A second man was on the passenger side of the truck, demanding money from Gibson. Allison could not see that man's face. She did see the man hit Gibson on the side of her head with a pistol.

Allison never looked toward the alley to see if others were with the two men or if there was a vehicle.

Allison was holding the keys to the truck and somehow triggered the truck's alarm from the key fob. When the alarm sounded, she saw the man on Gibson's side of the truck step back, hold the gun in both hands, and shoot Gibson twice from 3 to 4 feet away. Allison later testified that she saw the "life drain out of [Gibson's] eyes."

4

Allison would also testify that a third shot was fired and struck her in the arm. She believed she must have blacked out. She fell to the ground. Allison did not hear the men run away, but she heard scuffling on the passenger side of the truck after she was on the ground.

A neighbor heard the truck alarm sounding for at least a minute and then two or three gunshots. He then heard Allison's cries for help and called 911.

Allison was unsure how long she was unconscious, but when she came to she also called 911. She told the dispatcher that she had been shot and that she thought Gibson was dead. Allison was struggling to answer the dispatchers' questions. But she described one of the men as black, with his face covered, and 5'9" or 5'10" tall. She said she did not know the man.

The first officers who responded to the scene determined that Gibson had no pulse or other signs of life. Gibson's wallet was found in her back pocket; its contents included $99 in cash and a debit card.

Police found three .45 caliber shell casings and two bullets at the scene.

An autopsy conducted later the same day showed that Gibson had an injury to her left temple with significant bruising under the scalp and two separate gunshot wounds. The first bullet entered her body just below her collarbone on her right side, then exited through her left back, and then re-entered and exited her left arm. The second bullet grazed her right arm. The pathologist would later testify that stippling showed the murder weapon had been fired from 2 or 3 feet away. Gibson's cause of death was internal blood loss from the bullet that traveled through her chest.

The detectives assigned to the investigation of Gibson's murder would later testify that they had no immediate promising leads.

*August 1-2, 2011—Officers Encounter Bayate Covington*

On August 1-2, 2011, Ricardo Guadalupe was working as a private security guard at a local shopping center. He would testify that he saw a young male walking quickly in his direction. The man was bleeding from a head wound. Guadalupe stopped the man and called the Topeka Police Department.

Officer Cobb responded to Guadalupe's call. He identified the young man as Bayate Covington. Cobb would testify that Covington said he recognized Cobb as one of the officers who had chased him away from the scene of the attempted automobile break-in on July 18—the night Cobb and Lawler had apprehended DaQuan. Covington identified Netherland as the third man involved on July 18. Covington also said DaQuan's family thought Covington was snitching on DaQuan because only DaQuan had been arrested and that Ronald Wakes and Anceo Stovall had beaten Covington, causing his head wound.

Covington also mentioned that his group often used a .45 caliber weapon in their criminal activities. Because Cobb knew that Gibson had been murdered by a .45 caliber weapon, he contacted the detectives investigating Gibson's murder. The detectives then interviewed Covington.

Detective Brian Hill would later testify that Covington told the detectives that he and eight other persons had been involved in Gibson's homicide: Netherland, DaQuan, Wakes, Stovall, Frednetta Winston, Michael Wilkins, Kevin Wilkins, and Duane Richey. Detective Michael Barron would testify that Covington said the murder occurred during

an interrupted burglary attempt. Barron also said Covington provided details of the murder not known by the general public that the detectives were able to verify.

*Continuing Investigation and Charges*

Hill and Barron also interviewed Kevin. Barron would testify that Kevin identified Netherland as the person who shot Gibson.

After seeing his photo on news reports about Gibson's murder, Netherland turned himself in. Hill interviewed Netherland while he was in custody. Netherland denied any involvement in the murder of Gibson. He did not provide an alibi.

The State charged Netherland in an amended complaint with a total of seven criminal counts—Count 1:  first-degree felony murder for the killing of Gibson during the attempted aggravated robbery of Gibson in violation of K.S.A. 2011 Supp. 21-5402(a)(2), or in the alternative, Count 2:  first-degree felony murder for the killing of Gibson during the attempted burglary of her home in violation of K.S.A. 2011 Supp. 21-5402(a)(2); Count 3:  attempted aggravated robbery of Gibson in violation of K.S.A. 2011 Supp. 21-5420(b); Count 4:  aggravated robbery of Allison in violation of K.S.A. 2011 Supp. 21-5420(b); Count 5:  conspiracy to commit aggravated robbery in violation of K.S.A. 2011 Supp. 21-5420(b) and K.S.A. 2011 Supp. 21-5302; Count 6:  aggravated battery—intentional great bodily harm in violation of K.S.A. 2011 Supp. 21-5413(b)(1)(A); and Count 16:  attempted burglary of a motor vehicle in violation of K.S.A. 2011 Supp. 21-5807(a)(3). Additional Counts 7 through 15 were dismissed.

*Netherland's Jail Mail*

While in jail and awaiting trial, Netherland wrote letters to friends. An officer would testify that he captured and photocopied at the jail at least three pieces of outgoing

mail purportedly written by Netherland. The State would admit three letters into evidence at trial, but their authorship and chain of custody were aggressively challenged by the defense.

The first letter listed "Jimmy Netherland" as the sender. It was dated January 18, 2012. The author referenced an upcoming "wa[i]ving hearing" on January 30, 2012. The letter included the following message: "[E]verythang comming out now. that nigga duane telling the truth." Netherland had a waiver hearing on January 30, 2012.

The second letter listed "Jimmy Netherland" as part of its return address. It was addressed to "William Thomas." It included the following message: "[I] could of been out but niggas opening they mouth. my right hand man. snitchin on me. i got court on the 30th of this month." Thomas testified that he received the letter from Netherland. He also testified that he talked to Netherland and that Netherland had said "they were going to hit someone and that two people were shot and one survived."

The third letter listed "Jimmy Netherland" as the sender. It was dated February 4, 2012, and mentioned a recent hearing in which the author "gave up my rights to be trialed as an adult." It mentioned that Richey was testifying against him and that others were identifying him as the trigger man.

A forensic document examiner from the Kansas Bureau of Investigation (KBI) analyzed the three pieces of jail mail and compared them to known handwriting samples from Netherland. He would testify at trial that the known samples were inconsistent. He said that Netherland was likely to have written the three letters but that he could not positively identify him as the author because the known samples were not "naturally prepared."

Four of the nine accomplices agreed to testify for the State as part of plea agreements. They were Covington, Kevin, Winston, and Richey.

Covington testified that he selected Allison and Gibson's house to burglarize. On July 20, he met with eight friends—Netherland, DaQuan, Wakes, Stovall, Winston, Michael, Kevin, and Richey. According to Covington, Netherland and Michael were armed with .45 caliber handguns provided by Michael. Covington was armed with a sawed-off shotgun. The friends checked the front of the house first and, because no one was home, went around the back of the house to break in. Once in the alley, they saw Gibson's truck arrive. Covington said they should "do it a different day," but Michael insisted they move forward with their plan.

Covington said the group pulled in behind the truck and everyone got out. Netherland, Wakes, Stovall, Michael, and Covington approached the truck. Netherland went to the passenger side. Covington heard Michael speaking, but he did not remember what was said. He said that he, Netherland, DaQuan, and Winston then ran away in separate directions. Covington said Netherland was no longer carrying the .45 caliber handgun when Netherland ran. When Covington was in the front yard, he heard the truck alarm go off. When he was a block away, he heard three gunshots.

Covington admitted that he had given varying versions of events of the night of the murder and that he had lied earlier when he said a "dirty cop" had provided him details of the crime.

Kevin provided the same basic story about the nine persons who planned to break into the Allison-Gibson home. He said that Netherland and Michael were each armed

with a .45 caliber handgun and that Covington had a shotgun. Kevin also testified about a letter he wrote to Barron in which he said that he saw Netherland shoot Gibson.

Winston's story was similar as well, although she said she did not remember seeing Michael at the scene. She said that Netherland was armed with a .40 or .45 caliber handgun. Netherland went into the carport, approached the truck, and demanded money. She heard the car alarm, two gunshots, a 5-second pause, and a third gunshot. Netherland, Stovall, and Winston got back into the van in which the group had traveled to the house, and Kevin drove away. When Winston asked what happened, Stovall told her not to talk about it.

Richey's account of events was also very similar to the accounts of the others who testified. He said Netherland was armed with a "little handgun, little pistol." Richey said Netherland approached the passenger side of the truck. He saw Netherland and Stovall— not Michael—pull out guns, heard the alarm go off, and ran. He said he heard two gunshots when he was a couple of blocks away.

As part of the investigation, officers had searched the trailer home of Michael's girlfriend's father and found a .45 caliber gun, a box of ammunition, and Michael's cell phone. An officer pulled photos from Michael's phone, including multiple images of semi-automatic handguns. A firearms expert testified at trial that he had looked at the photos and identified the weapons as at least three different .45 caliber handguns. Detectives testified that they showed Covington and Kevin the photos of the weapons and that each identified one as the murder weapon. Richey also identified a weapon from the photos as similar to one of the handguns used at the scene of Gibson's murder.

A firearms and toolmark examiner from the KBI testified that he examined the three bullets and casings from the crime scene and determined that all three were fired from the same gun. He was able to test fire only the .45 caliber handgun seized in the

10

search of the trailer, and he said that it was not the murder weapon. Neither the murder weapon nor the other weapons from the photographs on Michael's phone were ever found.

Netherland's defense counsel, Linda Eckelman, presented one witness in Netherland's defense:  a KBI forensic biologist who testified that Netherland's DNA was not found on any of the items collected from the scene of Gibson's murder.

Prosecutor Christopher Biggs made closing remarks to the jury for the State. During those remarks, Biggs reminded the jury, "[Y]ou folks have to determine the weight and credibility of the witnesses."

During Eckelman's closing, she argued that the State's case was circumstantial and highlighted problems with the credibility of the State's witnesses. She also focused on the jail mail. She noted that the State did not present any evidence that Netherland's DNA or fingerprints were found on the letters. She also challenged the chain of custody of the letters, telling jurors that the State had proved only that the letters came from the jail; no witness could establish that the letters were obtained either from Netherland personally or from his cell. She also reminded the jury that the KBI examiner could not positively identify Netherland as the author of any of the letters.

In the rebuttal portion of his closing argument, Biggs returned to the subject of the letters when he told the jury, "Now, [f]olks, if for a minute you believe the State somehow contrived the letter, as suggested, well, you have to acquit the defendant." Eckelman did not object to this statement. Biggs then reminded the jurors of the evidence suggesting that Netherland had authored the letters.

Eckelman moved for a mistrial after deliberations began. She challenged Biggs' statement about acquittal if the letter had been "contrived" by the State. She characterized

11

the statement as prosecutorial misconduct for two reasons: (1) The prosecutor was vouching for the authenticity of the letters; and (2) the statement stood as a "double-dog dare," essentially challenging the jury to acquit Netherland if it did not think he wrote the letters. This, Eckelman said, was equivalent to the prosecutor "bargain[ing] with the jury."

The district judge denied Netherland's motion. She did "not agree that the State was wagering with the jurors or that the tone was inappropriate." The district judge also did not view the comment as one that "vouched" for the authenticity of the letters. She thought Biggs "was talking about the evidence."

The district judge instructed the jury on the elements of each of the charged crimes. She also provided the following written jury instruction on aiding and abetting: "A person is criminally responsible for a crime if the person, either before or during its commission, and with the mental culpability required to commit the crime[,] intentionally aids another to commit the crime." The instruction as read was identical. The instructions also warned the jury to "consider with caution the testimony of an accomplice."

*Posttrial Motion and Sentencing*

After the jury found Netherland guilty of first-degree murder on both the attempted aggravated robbery and attempted burglary of a dwelling theories, attempted aggravated robbery, aggravated robbery, conspiracy to commit aggravated robbery, aggravated battery, and attempted burglary of a motor vehicle, Netherland filed a motion for new trial based on Biggs' "contrived" remark.

Defense lawyer Eckelman asserted that she had been in a position to see Biggs' face at the time the remark was made, while the district judge had not. Again, she said Biggs issued "a 'double dog dare' vouching for the truth of the letters, and daring them to

12

disbelieve them and acquit the Defendant." Eckelman argued that this bolstering of the letters "crippled" Netherland's defense because she could not cross-examine the letters. She suggested that the letters were vital to the State's case because of the weakness of all of the other evidence against her client. She also suggested that the letters were problematic because the KBI document examiner could not positively identify Netherland as their author. She claimed that Biggs' argument was prejudicial because of the "vague[ness]" of the evidence against Netherland. She also challenged the credibility of the accomplices who testified against Netherland in exchange for plea deals, and she pointed out the lack of DNA evidence against Netherland.

Prosecutor Charles Kitt responded to the motion for new trial. He argued that Biggs' comment was not a misstatement of law or fact but was "simple rebuttal to the defendant's closing argument."

The district judge reviewed the evidence the State had presented about the letters. She analogized the situation before her to that in *State v. Smith*, 296 Kan. 111, Syl. ¶ 6, 293 P.3d 669 (2012), in which the court ruled that a prosecutor may "invite the jury to examine and analyze the evidence before it and to focus on inconsistencies beyond various stories told by a defendant." She treated Biggs' comment as "'invit[ing] the jury to analyze the evidence'" regarding the letters and as rebuttal to Eckelman's closing argument. The judge thus denied the motion for new trial.

With regard to Netherland's sentence, the district judge noted that she could not accept both convictions for first-degree murder because of the merger doctrine. Biggs requested that she proceed with entering the judgment on Count 1—felony murder for a killing committed during an attempted aggravated robbery—which the judge agreed to do. She sentenced Netherland to life in prison on Count 1 plus 114 months on the remaining counts.

13

Netherland purports to challenge the sufficiency of the evidence underlying all of his convictions, but his entire argument focuses on the crimes associated with Gibson's murder. He does not address the attempted burglary charge arising out of the events on July 18. This is insufficient, and we therefore regard the sufficiency claim on the attempted burglary conviction as abandoned. See *State v. Funk*, 301 Kan. 925, 933, 349 P.3d 1230 (2015) (issue not adequately briefed deemed abandoned).

This court recently reiterated its standard of review when the sufficiency of the evidence is challenged in a criminal case in *State v. Woods*, 301 Kan. 852, 874, 348 P.3d 583 (2015):

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' *State v. Lloyd*, 299 Kan. 620, 632, 325 P.3d 1122 (2014)."

Netherland was convicted of felony murder while attempting to commit aggravated robbery. The State pursued an aiding or abetting theory at trial.

In Kansas, felony murder is "the killing of a human being committed . . . in the commission of, attempt to commit, or flight from any inherently dangerous felony." K.S.A. 2011 Supp. 21-5402(a)(2). Aggravated robbery is "knowingly taking property from the person or presence of another by force or by threat of bodily harm to any person . . . when committed by a person who:  (1) Is armed with a dangerous weapon; or (2) inflicts bodily harm upon any person in the course of such robbery." K.S.A. 2011 Supp. 21-5420(b). And an attempt requires proof of three elements:  the defendant's

14

commission of any overt act toward the perpetration of a crime, the defendant's intention to commit the crime, and the defendant's failure to complete the crime. K.S.A. 2011 Supp. 21-5301(a); see *State v. Brown*, 303 Kan. 995, 1000, 368 P.3d 1101 (2016).

Because Netherland could be found guilty as an aider and abettor, the State had to prove only that (1) Netherland or another for whose conduct he was criminally responsible killed Gibson; and (2) the killing occurred while Netherland or another for whose conduct he is criminally responsible was attempting to commit aggravated robbery. See 2011 Supp. K.S.A. 21-5402(a)(2). The State did not have to prove that Netherland personally satisfied all of the elements of the underlying crime or that he fired the fatal shot. See *State v. Betancourt*, 301 Kan. 282, 304-05, 342 P.3d 916 (2015).

In his sufficiency challenge, Netherland focuses his argument on evidence the State did not have:  DNA, the murder weapon, and fingerprints.

But Netherland's jury heard ample direct and damning evidence of his participation in all of the events leading to Gibson's murder, including the testimony of four accomplices who identified Netherland as willing and armed. See *State v. Scaife*, 286 Kan. 614, 620, 186 P.3d 755 (2008) ("Direct evidence is such evidence which, if believed, proves the existence of a fact without inference or presumption, as for example the testimony of an eyewitness."). These accomplices testified that Netherland was with them as they drove to the Allison-Gibson house, that Netherland was armed, and that he approached Gibson's side of the truck and demanded money from her. At least one participant, Kevin, identified Netherland as the trigger man. And, because Gibson's wallet containing cash and a debit card remained in her pocket at the scene, the jury could easily infer failure to complete an aggravated robbery.

Netherland's sufficiency challenge also relies on inconsistencies in the testimony of Covington, Kevin, Winston, and Richey. Again, his argument falls short; such

15

inconsistencies cannot transform what is otherwise sufficient evidence as a matter of law into insufficient evidence. The jury was well-informed about prior inconsistent statements given by these accomplices and the fact that each had received a plea deal in exchange for testimony. It heard Eckelman aggressively attack these weaknesses in the State's case, and the jury was appropriately instructed to view the testimony of accomplices with a jaundiced eye. In spite of all of this, the jury's verdicts of guilt mean that it must have determined that Netherland's accomplices were credible. This court will not reweigh the jury's credibility determination on appeal. See *State v. Corbett*, 281 Kan. 294, 310, 130 P.3d 1179 (2006) (jury, not appellate court, charged with determining witness credibility).

Netherland also takes a swipe at sufficiency by arguing that the admission of the State's evidence of photographs of weapons found on Michael's phone encouraged the jury to improperly stack inferences. See *State v. Williams*, 229 Kan. 646, 649, 630 P.2d 694 (1981) (inference may not rest upon another inference). Although the murder weapon was never found, photographs of at least three .45 caliber handguns were admitted, and certain of the witnesses testified that the weapons were consistent with the type of weapon used to kill Gibson. Covington also said that Michael supplied the weapons used on the night of the crimes. We disagree with Netherland's characterization of this evidence. Rather than encourage improper inference stacking, all of it circumstantially supported the single inference that Michael was in possession of the murder weapon about the time of Gibson's murder. See *State v. Carr*, 300 Kan. 340, 366, 329 P.3d 1195 (2014), *rev'd and remanded on other grounds* 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016) ("Circumstantial proof is still proof. It is not equivalent to impermissible inference-stacking. It can rise to the level of beyond a reasonable doubt."). The jury's combination of that inference plus direct testimony about Michael supplying the weapons and Netherland participating would not have been error at all, and it certainly did not render the evidence of the felony murder insufficient as a matter of law.

16

Netherland's final mode of attack on the sufficiency of the evidence rests on an at-least-implied assertion that the State failed to prove that he was the trigger man. Again, the State was not required to prove that Netherland fired the fatal shot in order to convict him as an aider and abettor of felony murder based on the attempted aggravated robbery of Gibson. Even if the State had been required to present such evidence, it did so successfully.

In summary, the evidence presented by the State in this case was entirely sufficient to support Netherland's conviction for felony murder of Gibson. And the totality of the evidence sufficient to prove that crime also was legally sufficient to support Netherland's convictions for attempted aggravated robbery, aggravated robbery of Allison, conspiracy to commit aggravated robbery, and aggravated battery. See *State v. Herron*, 286 Kan. 959, 968, 189 P.3d 1173 (2008) (sufficient evidence of aiding and abetting first-degree felony murder; defendant participated in planning, mobilization, shooting).

Netherland's appellate sufficiency challenge is wholly without merit.

PROSECUTORIAL MISCONDUCT

Netherland's second appellate challenge focuses on Biggs' statement during closing argument, "Now, [f]olks, if for a minute you believe the State somehow contrived the letter, as suggested, well, you have to acquit the defendant." In essence, on appeal, Netherland argues that this statement amounted to Biggs' erroneous expression of personal belief that Netherland authored the jail mail and that he was guilty of the crimes charged.

In *State v. Sherman*, 305 Kan. ___, ___ P.3d ___, 2016 WL 4719688 (2016), we announced a new framework for consideration of criminal defendants' challenges to their convictions and sentences based on the behavior of prosecutors. *Sherman* has drawn a

17

distinction between prosecutorial conduct that is merely negligent or careless and prosecutorial conduct that is intentional or in some way malicious. 2016 WL 4719688, at *13, 17. Either can lead to closing argument error if it means that the prosecutor has strayed outside the wide latitude allowed the State's lawyer when discussing the evidence. Such an error, a violation of the defendant's right to due process, is subject to appellate court examination for harmlessness under the federal constitutional standard set forth in *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *Sherman*, 2016 WL 4719688, at *13-14.

Because *Sherman* was not decided until after this case was argued and fully submitted for decision, the parties have not had an opportunity to address it. We will therefore apply our old prosecutorial misconduct framework to the claim advanced here, noting only that application of the new framework would not make a difference in the outcome.

Our old framework has been stated often:

"We review such claims even when a contemporaneous objection was not made at trial. *State v. Anderson*, 294 Kan. 450, 461, 276 P.3d 200 (2012), *cert. denied* 133 S. Ct. 529 (2012). Our analysis has two steps. First, the court determines whether the prosecutor's comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. If the comments were improper and constituted misconduct, the appellate court must determine whether the comments prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Roeder*, 300 Kan. 901, 932-33, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015). In the second step, we consider three factors: (1) whether the misconduct was gross and flagrant, (2) whether the misconduct showed ill will on the prosecutor's part, and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. *State v. Williams*, 299 Kan. 509, 540, 324 P.3d 1078 (2014). None of these factors is individually controlling. Before the third factor can ever override the first two factors, we must be able to say that the harmlessness tests of both

18

K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), have been met. *Williams*, 299 Kan. at 540-41. As a practical matter, however, if the constitutional harmless error test is met, the statutory test also will be met. See *State v. Lowrance*, 298 Kan. 274, 282, 312 P.3d 328 (2013) (when State meets constitutional harmlessness test it necessarily also meets lower statutory harmlessness test as well). Under the constitutional test, the party benefitting from the error must demonstrate beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record, *i.e.*, there is no reasonable possibility that the error contributed to the verdict. *Williams*, 299 Kan. at 541." *State v. Fisher*, 304 Kan. 242, 251-52, 373 P.3d 781 (2016).

Under this standard, Netherland's second issue on appeal gets him no farther than his first.

This court has previously considered whether a prosecutor's statement amounts to improper vouching for a State witness or another aspect of its evidence. We have held there was improper vouching in the following arguments: "'I would submit to you that he is an honest person,'" and, "'He's very honest,'" *State v. Marshall*, 294 Kan. 850, 857, 281 P.3d 1112 (2012); "'[Y]ou trust children until you have a reason not to. We assume that. We assume we have taught them correctly,'" *State v. Magallanez,* 290 Kan. 906, 914, 235 P.3d 460 (2010); "'She was just diagnosing this child and what was wrong with her. That's all she was doing and I think that her testimony was reliable. It was credible,'" *State v. Brinklow*, 288 Kan. 39, 50-51, 200 P.3d 1225 (2009); and "'These kids aren't lying,'" and, "'This defendant is guilty,'" *State v. McHenry*, 276 Kan. 513, 523-25, 78 P.3d 403 (2003), *disapproved of on other grounds in State v. Gunby*, 282 Kan. 39, 56-57, 144 P.3d 647 (2006).

Conversely, this court has rejected claims of improper vouching when a prosecutor responds to a defense attack on the reliability of State evidence by explaining to jurors what they should consider when making credibility determinations. For example, in *State*

19

*v. Ortega*, 300 Kan. 761, 775-77, 335 P.3d 93 (2014), we held that the prosecutor was within the wide latitude of permissible comment when asking, "'What reason do [State witnesses] have to lie to you?'" In *State v. Stone*, 291 Kan. 13, 19-20, 237 P.3d 1229 (2010), we recognized that certain comments—"'A.L. told [the jury] what happened,'" and, "'she is a credible witness'"—were problematic in isolation but did not require reversal in context, *i.e.*, as "the brackets around an argument that detailed for the jury the factors that it could and should consider in determining the credibility of the witness." In *Scaife*, 286 Kan. at 623-25, we approved of the prosecutor's remarks urging the jury to evaluate a 911 recording—"'Listen to his voice, listen to his pleading, listen to the manner in which he asked for help. That's how you know that he's telling the truth'"—and rebutting a defense challenge to a witness—"'Now, why believe Patrick Ross? Folks, you saw him, you've heard him from the very beginning of this case which was seconds after it began. Evaluate his testimony, evaluate his demeanor, evaluate what he told you, and you don't have any other conclusion.'" And, in *State v. Davis*, 275 Kan. 107, 122, 61 P.3d 701 (2003), we held that there was no misconduct when the prosecutor demonstrated how the evidence supported witness testimony.

When Biggs' literal statement in this case is compared to the statements made in these earlier cases, we are completely comfortable in concluding that it did not amount to improper vouching outside the wide latitude permitted prosecutors in discussing the evidence. Eckelman had mounted a full-throated attack on the chain of custody of the jail mail, including reiterating that the letters were not retrieved from Netherland personally or from his cell. She also had reminded the jury that the KBI handwriting expert could not positively identify Netherland as the letters' author. The prosecutor's statement, again, taken literally, was a pragmatic, vernacular-based answer to the defense attack, telling the jury that if it believed Netherland did not write the letters, it was free to acquit him. In fact, the statement was actually helpful rather than harmful to the defense, making more of the letters than they probably deserved in view of other, overwhelming evidence of Netherland's guilt.

20

But Netherland's appellate challenge does not rest merely on Biggs' literal statement. Rather, he focuses on what he believes to have been the tone and tenor of its delivery, arguing that the prosecutor's sarcasm means there was reversible misconduct.

We have not previously considered whether a prosecutor's sarcastic tone alone is sufficient to make a proper comment during closing argument improper. Our Court of Appeals has considered challenges to a prosecutor's sarcastic tone on at least two occasions and held that neither instance gave rise to reversible error. See *State v. Haugland*, No. 105,218, 2012 WL 1450440, at *8 (Kan. App. 2012) (unpublished opinion), *rev. denied* 297 Kan. 1251 (2013) (single, isolated sarcastic comment); *State v. Peterson*, No. 89,752, 2004 WL 2796395, at *3 (Kan. App. 2004) (unpublished opinion), *rev. denied* 279 Kan. 1009 (2005) (sarcasm "may not be the most desirable or even the most effective" but not reversible).

But we need not reach this fairly esoteric plain today, because the record before us conflicts with Netherland's characterization of Biggs' remark. The record shows that Netherland raised the issue of Biggs' sarcasm in the district court, and the district judge specifically stated that she did not think Biggs' tone was "inappropriate." The district judge was present in the courtroom and made this contemporaneous observation; we have no basis for quarrelling with it on appeal.

Because Biggs' statement was within the wide latitude afforded a prosecutor discussing the evidence during closing arguments, there was no prosecutorial misconduct that requires us to engage in a harmlessness analysis.

21

CONCLUSION

Having carefully examined each of Netherland's appellate challenges, we conclude that none merits reversal of any of his convictions. The judgment of the district court is affirmed.